IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| BEAVER COUNTY, UTAH, a Utah political subdivision,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR; RYAN ZINKE, Secretary of the Interior; UNITED STATES BUREAU OF LAND MANAGEMENT; MICHAEL NEDD, in his capacity as Acting Director of the Bureau of Land Management; EDWIN L. ROBERSON, in his capacity as Utah State Director of the Bureau of Land Management; and DOES 1-10,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING MOTION TO DISMISS<br><br>Case No. 2:17-CV-00088-CW<br><br>Judge Clark Waddoups |

Before the court is the United States Department of Interior; Secretary of Interior Ryan Zinke ("the Secretary"); the Bureau of Land Management ("BLM"); Acting BLM Director, Michael Nedd; and BLM State Director Edwin L. Roberson's (collectively "the Federal Defendants") Motion to Dismiss. (ECF No. 20.) For the reasons set forth below, the court GRANTS the motion, without prejudice, and also GRANTS Plaintiff leave, based on the representations made at the hearing before the court on July 19, 2017, to amend its Complaint for Declaratory and Injunctive Relief. (ECF No. 2.)

## INTRODUCTION

Under the Wild Horse Act ("the WHA"), "[a]ll wild free-roaming horses and burros" are under the jurisdiction of the Secretary, who is authorized and directed to protect and manage

1

wild free-roaming horses and burros in a manner that will achieve and maintain natural ecological balance on public lands. (ECF No. 2 at 5.) Pursuant to the WHA, the Secretary and BLM are charged to oversee management of wild horses on public lands within designated "herd management areas" ("HMAs") established by the BLM. (*Id*.) In establishing HMAs, the BLM must consider the Appropriate Management Level ("AML") for the herd, the habitat requirement for the animals, as well as relationships with other uses of public and adjacent private lands. (*Id*.) Pursuant to statute, the BLM maintains a current inventory of wild horses on public lands in each HMA and makes a determination whether there is overpopulation, and then determines whether removal, destruction of excess animals, or other means are necessary to achieve the AML. (*Id*.)

The Sulphur Herd Management Area ("Sulphur HMA") is located in portions of western Beaver, Iron and Millard Counties. (ECF No. 2 at 6.) The Federal Land Policy Management Act requires that the Secretary, and by extension the BLM, manage public lands under Resource Management Plans ("RMP"). (ECF No. 2 at 4). The Sulphur HMA is managed under two RMPs which require the BLM to remove excess wild horses and maintain the population below the established AML. (ECF No. 2 at 7.) Based on the controlling RMPs, the BLM concluded the AML for the Sulphur HMA is a range of 135 to 180 adult horses, or 165 to 250, if wild horses of all ages are included. (*Id*.) As of March 2017, it is estimated that about 1,150 horses were living in the Sulphur HMA. (*Id*. at 7.)

Despite finding that there is an overpopulation of wild horses, and that excess wild horses need to be removed from the Sulphur HMA, the BLM authorized a Gather Plan that does not immediately and permanently remove all excess wild horses in violation of the Act. (ECF No. 2

at 8.) Instead, the BLM plans to conduct gathers of wild horses two to four times a year over a six to ten year period, with an expectation that the AML will not be achieved for at least six to ten years. (ECF No. 2 at 9.) The BLM began to implement this Gather Plan on about January 18, 2017. (*Id.*) During a gather in January 2017, the BLM removed about 60 to 70 percent of the wild horse population in the Sulphur HMA; however, this still leaves an excess of about 350 to 450 wild horses in the area. (*Id.*) Moreover, pursuant to the Gather Plan, the BLM intends to return approximately 400 of the wild horses that were removed, including 200 mares treated with a contraceptive vaccine, back to the Sulphur HMA. (*Id.*) The contraceptive vaccine, PZP, is known to only be effective for one-year. (*Id.*) Thus, if the BLM proceeds as planned--conducting similar gathers every few years, with the administration of fertility treatment and subsequent releases--the population of wild horses in the Sulphur HMA may not be reduced enough to reach the AML over the next ten-year period. (ECF No. 2 at 10.)

Accordingly, on February 6, 2017, Plaintiff, Beaver County ("the County"), filed a Complaint for Declaratory and Injunctive Relief ("the Complaint"). (ECF No. 2.) The Complaint alleges five causes of action: 1) failure to comply with the RMPs in violation of the Administrative Procedures Act ("APA"); 2) failure to immediately remove excess wild horses in violation of the APA; 3) allegations that the Federal Defendants' actions are arbitrary and capricious in violation of the APA; 4) mandamus relief; and 5) injunctive relief. (ECF No. 2 at 15- 20.)

Regarding allegations of "Local Harm" and "Harm to Rangeland and Wild Horses," the Complaint states, in relevant part, as follows:

> 59) The excess wild horse population has caused, and continues to cause, serious harm to Beaver County and its citizens.

3

. . .

63) Approved animal unit month ("AUM") is the amount of forage necessary to sustain a single cow and calf pair, five sheep, or five goats for a month period. Grazing permittees are allotted specific amounts of approved AUMs. Between 1954 and 2014 there was a 53 percent decrease in approved AUMs, from 18.2 million AUMs in 1954 to 8.3 million AUMs in 2014.

64) Without access to land suitable for multiple uses and a sustained yield, agricultural proprietors will have to limit or shut down their operations, significantly reducing Beaver County's tax base. Agriculture has always been, and continues to be, a key industry to Beaver County's economy. Earnings from agricultural labor in Beaver County totaled $23,003,000 in 2015, representing 14.3 percent of all labor earnings in [the] County.

65) While the full economic impact of the existence of wild horses in excess of the AMLs has yet to be analyzed, one case study indicated that the yearly opportunity cost (i.e. the loss of potential gain) for each wild horse above the median of the AML range is $1,900. Currently, there are approximately 100 to 200 excess wild horses on the Sulphur HMA. Using the figure from the case study, the opportunity costs of the excess wild horses currently in the HMA is between $190,000 and $380,000. If the BLM returns 400 more excess wild horses, the opportunity costs will be between $950,000 and $1,1140,000[sic].

66) The excess wild horses and related depletion of forage and water resources infringes upon the rights of Beaver County citizens who hold grazing permits and leases to conduct livestock operations on private, state, and federal lands administered by the BLM. The excess wild horses impacts Beaver County's economy with the loss of the number of grazing permits allowed and the revenue the cattle producers and ranchers contribute to the County.

67) The excess wild horses also pose a significant risk to public health and safety as the overcrowding leads to wild horses escaping the boundaries of the Sulphur HMA and wandering onto private property and highways. The BLM indicated in a 2016 census that the number of wild horses spread outside the Sulphur HMA was more than had ever previously been reported.

. . .

73) As a result of this failure, there has been and will continue to be substantial degradation of the land and wild horses will be forced to endure starvation, dehydration, disease, injury, and ultimately horrific deaths.

74) Beaver County, in addition to sustaining the environmental harms above, has and will continue to suffer significant financial harm. As the agricultural industry subsides because of the land degradation, Beaver's tax base will decrease[.] (ECF No. 2 at 13-16.)

In response to the County's Complaint, the Federal Defendants moved to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The Federal Defendants argue the County lacks standing to bring any of these claims because it has not suffered an injury in fact fairly traceable to BLM's actions. (ECF No. 20 at 7.)

## STANDARD OF REVIEW

"Since federal courts are courts of limited jurisdiction, we presume no jurisdiction exists absent a showing of proof by the party asserting federal jurisdiction." *U.S. v. Koch Indus., Inc.*, 971 F.2d 548, 551 (10th Cir. 1992) (internal citation omitted). To establish jurisdiction, the County, the party invoking jurisdiction in this case, must "allege in [its] pleading the facts essential to show jurisdiction," and "must support [those facts] by competent proof." *Id*. (internal citations omitted). "Where a party attacks the factual basis for subject matter jurisdiction, the court does not presume the truthfulness of factual allegations in the complaint, but may consider evidence to resolve disputed jurisdictional facts." *Radil v. Sanborn W. Camps, Inc.*, 384 F.3d 1220, 1224 (10th Cir. 2004) (internal citations omitted). "Standing jurisprudence is a highly case-specific endeavor, turning on the precise allegations of the parties seeking relief." *Wyoming v. Lujan*, 969 F.2d 877, 882 (10th Cir. 1992) (internal citations omitted).

**ANALYSIS**

"Article III of the Constitution limits the 'judicial power' of federal courts to the resolution of 'cases and controversies.'" *Wyoming,* 969 F.2d at 880 (internal citation omitted). "One of the requirements of a 'case' or 'controversy' is that the plaintiff have 'standing' to challenge the action sought to be adjudicated in the lawsuit." *Id*. (internal citations omitted). To establish standing under Article III, the County must establish three elements. The first is an "injury in fact" –"an invasion of a legally-protected interest which is (a) concrete and particularized; and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Id*. (internal citations omitted). To establish the second element, the County must show "a causal connection between the injury and the conduct complained of—the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Id*. (internal citation omitted). Finally, to establish the third element, redressability, the County must demonstrate that it is "'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision." *Id*. (internal citation omitted).

Beyond these three constitutional elements for standing, a plaintiff must also satisfy the following sets of prudential principles:

1) the plaintiff generally must assert his or her own legal rights;

2) the court must refrain from adjudicating 'generalized grievances' most appropriately addressed by one of the other branches of government; and

3) the plaintiff's complaint must fall within the zone of interest protected or regulated by the statute or constitutional guarantee in question.

*Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1450-51 (10th Cir. 1994) (internal citations omitted). The court conducts a prudential standing analysis "only after Article III standing has been established." *Id*. (internal citations omitted). As discussed more fully below, based on the facts pled in the current Complaint, the County has not established the first element of Article III standing, "injury in fact," regarding allegations regarding: 1) wild horse health, 2) harms to grazing permittees or motorists on Highway 21, and/or 3) its tax base.

    A. <u>The County Cannot Assert an Injury Based on Wild Horse Health</u>

Pursuant to the Wild, Free-Roaming Horses and Burros Act ("WHBA"), all wild free-roaming horses and burros on public lands are under the jurisdiction of the Secretary for the purpose of management and protection. *See* 16 U.S.C. § 1333(a). Even when wild free-roaming horses "stray from public lands onto private owned land, the owners of such land may inform the nearest Federal marshal or agent of the Secretary, who shall arrange to have the animals removed. In no event shall wild free-roaming horses . . . , be destroyed except by agents of the Secretary[.]" *See* 16 U.S.C. § 1334. And the only way state and local governments may manage wild horses is through cooperative agreements with the United States. *See* U.S.C. § 1336. Given the federal government's exclusive jurisdiction over management and protection of wild free-roaming horses and burros, the County's alleged concern for the horses' "starvation, dehydration, disease, injury, and ultimately horrific deaths" is misplaced because it has no cognizable interest in managing or protecting wild free-roaming horses and/or burros. "To establish an injury in fact, the [County] must show a 'distinct and palpable injury to itself.'" *Wyoming*, 969 F.2d at 881. Thus, the abstract injury to the wild horses' health alleged in the Complaint does not establish a palpable and distinct injury to the County. Accordingly, the

7

County has failed to allege an "injury in fact," the first element of standing. As such, any claims based on "wild horse health" must be dismissed for lack of standing.[1]

    B. <u>The County Cannot Assert an Injury Based on Alleged Harms to Federal Grazing Permittees or Motorists on Highway 21</u>

In its Complaint, the County alleges "excess wild horses and related depletion of forage and water resources infring[e] upon the rights of Beaver County citizens who hold grazing permits and leases to conduct livestock operations[.]" ECF No. 2 at 14. The County also alleges the "wild horses also pose a significant risk to public health and safety . . . [as they] escap[e] the boundaries of the Sulphur HMA and wander[] onto private property and highways."[2] *Id*. at 15. Under the doctrine of *parens patrie*, however, counties are precluded from bringing claims against the federal government on behalf of the county's citizens. *Madigan*, 14 F.3d at 1453, n. 3 (finding that *parens patrie* doctrine precluded county from bringing claim against federal government on behalf of county's citizens); *see also Wyoming*, 969 F.2d at 882-3 (the State lacked standing as *parens patrie* to bring action on behalf of its citizens against the federal government because the State must assert its own legal rights, and not those of third parties). Thus, claiming an injury based on private rights or interests of the grazing permittees or "public health and safety" on Highway 21 is the precise type of *parens patrie* claim the County cannot assert against the federal government. Since due to *parens patrie* prohibition the County will not

---

[1] Since the first element of standing is not met, the court does not need to address the elements of causal connection or redressability.

[2] The main highway the court could locate on state maps, that is adjacent to the Sulphur HMA, is Highway 21. At the hearing in July, the Federal Defendants gave the court a map labeled Utah Herd Management Areas, U.S. Department of the Interior Bureau of Land Management Wild Horse and Burro Program, showing the location of the Sulphur HMA and Highway 21, thus confirming the court's prior findings.

be able to establish "injury in fact" with regard to these allegations, these must also be dismissed for lack of standing.[3]

      C. <u>The County Has Not Established an Injury Based on Speculative Injury to Its Tax Base</u>

As discussed above, to establish the first element of standing the County bears the burden of proving it has suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent," not "conjectural" or "hypothetical." *Wyoming*, 969 F.2d at 880. The County claims it "will continue to suffer significant financial harm. As the agricultural industry subsides because of the land degradation, Beaver's tax base will decrease." ECF No. 2 at 16, 17. As for specific factual pleadings, regarding injury to its tax base, the County avers as follows:

> 63) . . . Between 1954 and 2014 there was a 53 percent decrease in approved AUMs, from 18.2 million AUMs in 1954 to 8.3 million AUMs in 2014.
>
> 64) Without access to land suitable for multiple uses and a sustained yield, agricultural proprietors will have to limit or shut down their operations, significantly reducing Beaver County's tax base. . . . Earnings from agricultural labor in Beaver County totaled $23,003,000 in 2015, representing 14.3 percent of all labor earnings in [the] County.
>
> 65) While the full economic impact of the existence of wild horses in excess of the AMLs has yet to be analyzed, one case study indicated that the yearly opportunity cost (i.e. the loss of potential gain) for each wild horse above the median of the AML range is $1,900. Currently, there are approximately 100 to 200 excess wild horses on the Sulphur HMA. Using the figure from the case study, the opportunity costs of the excess wild horses currently in the HMA is between $190,000 and $380,000. If the BLM returns 400 more excess wild horses, the opportunity costs will be between $950,000 and $1,1140,000[sic].

ECF No. 2 at 13-14. The court will address each of these allegations below.

---

[3] In paragraph 66 of the Complaint, the County also alleges the loss of number of grazing permits is affecting the revenue of cattle producers and is thus "impact[ing] Beaver County's economy." The allegations pertaining to impact to the County's tax base is a separate injury in fact that pertains to the County, not the grazing permittees. This issue is addressed below in subsection c.

First, in the Complaint the County did not allege it owns AUMs that have decreased since 1954. In fact, as properly admitted by the County in the Complaint, "[g]razing permittees are allotted specific amounts of approved AUMs." ECF no. 2 at 13. Notably, the court reviewed the BLM website cited in footnote 6 of the Complaint and it does not readily provide information regarding the alleged decrease of AUM's from 1954 to 2014. The Complaint also alleges that "[w]ithout access to land suitable for multiple uses and a sustained yield, agricultural proprietors will have to limit or shut down their operations." As discussed above, the County does not have standing as *parens patriae* to bring an action against the federal government on behalf of its citizens, in this case the grazing permittees who are allegedly experiencing a decrease in AUMs or may potentially lose their operations. *Wyoming*, 969 F.2d at 883. Thus, the County cannot bring a claim for loss based on "a decrease of AUMs" or the grazing permittees' "loss of operations."

Next, the Complaint alleges that earnings from agricultural labor in the County "totaled $23,003,000 in 2015," and cites to a Profile in Agriculture, attached as Exhibit B to the Complaint. The court reviewed Exhibit B and determined the amount cited by the County, $23 million for farm earnings, includes livestock and crops, but Exhibit B does not provide a specific breakdown for either. Also, according to the exhibit, this amount has increased by 204.5 percent from 1970 to 2015--from $7.6 to $23.0 million. ECF No. 2-2 at 7. With respect to the County, conclusory allegations and citations to an off-base study do not establish it is suffering a loss to its tax base. *See Wyoming v. U.S. Dept. of Interior*, 674 F.3d 1220, 1232 (10th Cir. 2012).

Finally, the court addresses the allegation regarding the case study indicating "that the yearly opportunity cost (i.e. the loss of potential gain) for each wild horse above the median of

the AML range is $1,900." The County obtained this figure from a study published in 1999 regarding an allotment of horses in the Whiskey Peak allotment of Wyoming. ECF No. 2-3. It is unknown how that HMA compares to the Sulphur HMA. Again, citation to a twenty year old study, to a herd of horses in a different state, is not sufficient to establish the County is suffering loss to its tax base. From that study, the County extrapolates that "[i]f the BLM returns 400 more excess wild horses, the opportunity costs will be between $950,000 and$1,1140,000[sic]." Again, these figures are "conjectural" and "hypothetical." Ultimately, the County has failed to meet its burden of showing injury in fact. "Record facts consisting of conclusory statements and speculative economic data are insufficient to lead us to any other conclusion." *Wyoming*, 674 F.3d at 1233-34. Accordingly, this action must be dismissed, without prejudice, because the County lacks Article III standing to bring this current action.

The County will be allowed to amend its Complaint because, like the court in *Wyoming*, "[w]e do not foreclose the argument that reduced tax revenues can provide a [county] with Article III standing. . . [But], a [county] must show a 'fairly direct link between the [county's] status as a . . . recipient of revenues and the legislative or administrative action being challenged." *Wyoming*, 674 F.3d at 1234 (internal citation omitted).[4] Based on the representation of counsel at oral argument, it appears the County may be able to establish standing based upon recently developed facts and studies. If the County elects to file an amended complaint, it should address each of the requirements for Article III standing and prudential standing.

The court ORDERS as follows:

---

[4] Since the County did not meet its burden as to Article III standing, the court did not need to address whether the County meets the prudential requirements of standing.

11

1. The Complaint is dismissed without prejudice.

2. The County is granted leave to amend.

3. If the County elects to amend, the Amended Complaint must be filed on or before November 10, 2017.

DATED this 6th day of October, 2017.

BY THE COURT:

Clark Waddoups
United States District Court Judge